In re EAGLE BUS MANUFACTURING, INC., Greyhound Lines, Inc., Trailways Commuter Transit, Inc., Buslease, Inc., GLI Bus Operations Holding Company, GLI Food Services, Inc., GLI Holding Company, Greyhound Travel Services, Inc., Western Greyhound Lines Co., Southern Greyhound Lines Co., Eastern Greyhound Lines Co., Central Greyhound Lines Co., Debtors.

Bankruptcy Nos. 90–00985–B–11 to 90–00990–B–11 and 90–01984–B–11 to 90–01989–B–11.

United States Bankruptcy Court, S.D. Texas, Brownsville Division.

Oct. 10, 1991.

Shelby A. Jordan, Harlin C. Womble, Jr., Jordan & Shaw, Corpus Christi, Tex., Peter Shinevar, Bredhoff & Kaiser, Washington, D.C., for Greyhound Local Unions.

Vernon O. Teofan, Linda D. Sartin, Jenkens & Gilchrist, Dallas, Tex., for Sec. Pacific Business Credit, Inc.

Ryan Dyson, Deborah A. Welborn, Kleberg & Head, Corpus Christi, Tex., for Greyhound Dial Corp.

David R. Snodgrass, Gardere & Wynne, Dallas, Tex., for Official Unsecured Creditors Committee.

Thomas S. Hoekstra, Butler & Binion, Dallas, Tex., for Adirondack Trailways, Pine Hill Trailways, Carolina Trailways, Southeastern Trailways, The Independent Bus Companies Creditors' Committee.

Joseph J. Wielebinski, Decker, Hardt, Kopf, Harr, Munsch & Dinan, Dallas, Tex., for BusLease.

Oscar R. Cantu, Weil, Gotshal & Manges, Houston, Tex.

Margery E. Lieber, Asst. Gen. Counsel for Special Litigation, N.L.R.B., Milwaukee, Wis.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

RICHARD S. SCHMIDT, Bankruptcy Judge.

On August 27 and 28, 1991, the Court held a hearing (the "Hearing") on confirmation of the Third Amended Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code for Greyhound Lines, Inc. and its Affiliated Debtors (as modified, the "Plan") filed by the Debtors.[1] Appearing at the Hearing were counsel for the Debtors, the Creditors' Committee, the Official Steering Committee, the United States Trustee, the Secured Lenders, Dial, the Amalgamated Council of Greyhound Local Unions ("Union"), the National Labor Relations Board ("NLRB"), the United States of America on behalf of the Internal Revenue Service (the "United States"), the State of Texas ("Texas"), KLL, Ltd. and K.B.A., Inc. ("KLL"), Port Authority of New York and New Jersey ("Port Authority"), Crowley, Milner & Co. ("Crowley"), Elenar Associates Limited Partnership ("Elenar") and N.V. BN (Brumeca Division of BN) ("Brumeca").

The Court has reviewed and considered the testimony and the exhibits admitted into evidence at the Hearing, and the arguments of counsel presented at the Hearing. The Court has also considered all the objections to confirmation of the Plan filed by creditors and parties in interest. In addition, The Court, *sua sponte*, and on the motion of the Debtors without objection from any party, takes judicial notice of the entire record in these bankruptcy proceedings since the Petition Date, including specifically, but not limited to, all pleadings filed by the Debtors and all documentary evidence and testimony presented by the Debtors in these bankruptcy proceedings.

Based upon this record, the Court now finds and concludes that the Plan, except as it pertains to Eagle Bus Manufacturing, Inc., should be confirmed. In accordance with Bankruptcy Rules 7052 and 9014, the Court makes these findings of fact and conclusions of law in support of confirmation of the Plan.

### I.

#### *Jurisdiction*

1. Pursuant to 28 U.S.C. §§ 1334 and 157, and the Standing Order of Reference of the United States District Court for the Southern District of Texas dated August 9, 1984, the Court has jurisdiction to entertain the Debtors' request to confirm the Plan. The Hearing is a core proceeding under 28

---

1. Unless stated otherwise, all capitalized terms used in these Findings and Conclusions shall have the same meaning that they are defined to have in the Plan.

U.S.C. § 157(b)(2)(L), and venue of the Debtors' cases is proper in this District.

2. The Debtors are proper debtors under section 109 of the Bankruptcy Code and are proper proponents of the Plan under section 1121(a) of the Bankruptcy Code.

## II.

### *Background*

3. On June 4, 1990, the Debtors in Case Nos. 90–00985–B–11 through 90–00990–B–11 filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On November 1, 1990, the Debtors in Case Nos. 90–01984–B–11 through 90–01989–B–11 filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors have been operating their businesses and managing their properties as debtors-in-possession.

5. Pursuant to Bankruptcy Rule 1015(b) and Local Bankruptcy Rule 1015, the Debtors' cases have been administered jointly. No trustee or examiner has been appointed in these cases.

6. The Debtors filed the Plan and the Disclosure Statement on June 19, 1991.

7. On June 19, 1991, after numerous hearings and lengthy negotiations between the Debtors and various creditors and parties in interest, and on proper notice under the Bankruptcy Code and Bankruptcy Rules, the Court approved the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code. On June 20, 1991, the Court entered an order approving the Disclosure Statement. There were no objections to the Disclosure Statement as finally approved by this Court.

8. Pursuant to the order approving the Disclosure Statement, the Debtors were authorized and directed to serve, by July 10, 1991, all creditors and interest holders who were entitled to vote on the Plan a copy of (a) the Plan, together with Appendices I and II thereto, (b) the Disclosure Statement, together with all exhibits and attachments thereto, and (c) a ballot for accepting or rejecting the Plan (the "Plan Package"). The Debtors were also required to send by mail, by July 10, 1991, notice of the order approving the Disclosure Statement (the "Notice") to creditors or parties in interest (a) who were scheduled by the Debtors as having a "zero dollar" or "unknown amount" claim and who did not file a proof of claim as required by Bankruptcy Rule 3002; (b) who were unimpaired pursuant to section 1124 of the Bankruptcy Code; (c) who had not submitted to the Debtors their most current address or forwarding address; or (d) who would receive no distribution under the Plan and were therefore deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. The order approving the Disclosure Statement also fixed August 5, 1991, at 5:00 p.m., Central Daylight Savings Time as the last day for (a) filing and serving objections to confirmation of the Plan and (b) voting to accept or reject the Plan by delivering a copy of the ballot to the Debtors' tallying agent.

9. On July 5, 1991, the Debtors commenced mailing over 33,000 Plan Packages and over 34,000 Notices to the Debtors' creditors, equity security holders, and other parties in interest. The Debtors completed their mailing by July 9, 1991.

10. The Debtors subsequently identified and isolated all creditors, equity security holders, and other parties in interest with respect to whom a computer malfunction had resulted in the use of incomplete mailing labels. The Court granted the Debtors' request pursuant to Bankruptcy Rule 9006(c)(1) and Local Rule 9003 to reduce to 16 days the time by which those identified creditors, equity security holders, and other parties in interest could file and serve written objections to confirmation of the Plan and vote to accept or reject the Plan. On July 17, 1991, the Debtors completed the mailing of the Notice to the identified creditors, equity security holders, and other parties in interest not entitled to vote on the Plan. On July 19, 1991, the Debtors completed the mailing of the Plan Package to the identified creditors, equity security

holders, and other parties in interest entitled to vote on the Plan.

11. On August 9, 1991, the Court entered the Amended Scheduling Order Regarding Confirmation Hearing (the "Scheduling Order") setting forth pretrial and trial procedures in connection with the Hearing.

12. The Debtors, the Official Steering Committee, the NLRB, the Union, American Locker, KLL, and the United States were the only parties to designate exhibits pursuant to the Scheduling Order. KLL objected to the admission into the record of certain exhibits designated by the Debtors and the Official Steering Committee, but withdrew its objection at the commencement of the Hearing. No other party objected to any of the designated exhibits within the time periods set by the Scheduling Order. Accordingly, at the commencement of the Hearing, each and every designated exhibit was admitted into the record as evidence for all purposes.[2] In so doing, the Court overruled the oral objection of the NLRB to the admission of certain of the Debtors' designated exhibits that had been prepared by the Debtors' investment advisor in these cases, Goldman, Sachs & Co. ("Goldman").

13. The Debtors, the Official Steering Committee, American Locker Security Systems, Inc. ("American Locker"), KLL, and the United States were the only parties to identify possible witnesses for the Hearing pursuant to the Scheduling Order. Three expert witnesses (Ms. Rosemary Collyer, Mr. Ken Leet, and Mr. Richard Holmes) were called by the Debtors to testify at trial. No other witnesses were called by any other party in interest.

14. Ms. Collyer, a former general counsel to the NLRB and currently serving as labor counsel to GLI, was qualified to testify as an expert regarding NLRB procedures. She testified *inter alia*, to the time it would take to litigate to a final award of back pay an unfair labor practice proceeding involving the same or similar issues and complexities currently called into play by the NLRB Proceeding. In her opinion, it would take eight to twelve years to obtain a final and enforceable back pay award if such matters were fully litigated to conclusion, assuming that no settlement was reached. Ms. Collyer testified that only a very small percentage of back pay awards are litigated to final judgments. Most are settled.

15. Mr. Leet, currently serving as a vice president for Goldman, was qualified as an expert regarding matters of corporate finance. He testified, *inter alia*, as to the ability of a company similar to GLI in terms of operations and capital structure to raise additional cash or incur additional debt during the next ten years, assuming present market conditions and the validity of GLI's business plan as set forth in the Disclosure Statement. In his opinion, such a company would be able to raise approximately $184 million in new capital in 1994 and over $300 million by 1998. He also testified as to current market rates of interest and to the appropriateness of the ten percent (10%) interest rate for Priority Tax Claims and Secured Claims receiving deferred payments under the Plan.

16. Mr. Holmes, currently serving as the partner-in-charge of the southwest region's corporate recovery services practice for Arthur Andersen & Co., was qualified as an expert to testify as to the appropriate interest rate for unpaid Priority Tax Claims and Secured Claims receiving deferred payments under the Plan. In his opinion, an interest rate of ten percent (10%) per annum would provide the holders of such Claims with a value as of the Effective Date equal to the allowed amount of their respective Claims.

17. The Court finds the testimony of the three witnesses called by the Debtors

---

2. This Court's practice, as well as its announced procedure, requires all objections to be made to documentary evidence prior to trial. Those objections that require foundation evidence are ruled upon after the evidence is offered. The Court encourages waiver of all objections if there is no real dispute. No objection of any kind was made to most evidence offered and thus it was admitted for all purposes. The Court may, of course, assign whatever weight it deems appropriate to the evidence.

to be credible and substantially uncontroverted.

18. The exhibits designated by the NLRB and the Union as NLRB Exhibits 101 to 110 were admitted into evidence for all purposes, without objection, at the outset of the hearing. At the Hearing, the NLRB offered two additional exhibits, annual reports of the NLRB for the fiscal years 1988 and 1989, which were admitted into the record.

19. On the motion of the Debtors, without objection from any party, the Court took judicial notice of the entire record in these cases.

20. The Debtors' evidence was substantially uncontroverted.

21. Mr. Richard Marlar, an attorney for the United States Trustee, appeared on the record and stipulated, without objection from any party, that all fees required to be paid by the Debtors pursuant to 28 U.S.C. § 1930 have been paid through the second quarter of 1991.

22. The Debtors have proposed several modifications to the Plan in response to objections by creditors. Pursuant to Bankruptcy Rule 3019, sufficient notice of these modifications was given to parties in interest. The modifications comply with all relevant provisions of the Bankruptcy Code and have been approved by separate orders of this Court.

23. On request of the Debtors, and without objection from any party at the Hearing, the confirmation of the Plan as it pertains to Eagle Bus Manufacturing, Inc. has been severed from confirmation of the Plan as it pertains to the other Debtors, and the Hearing with respect to Eagle Bus Manufacturing, Inc. has been continued.

## III.

### Overview of the Plan

24. A. *Structure*

The Plan provides generally for the consolidation of the Debtors' operations under a centralized corporate structure following consummation of the Plan, with GLI as the principal operating entity. GLI Holding will be merged with and into a wholly-owned subsidiary of GLI, with GLI Holding as the surviving corporation. It is anticipated that substantially all the assets of TCT will be dissolved. If, however, for any reason the sale of TCT cannot be effected, TCT will remain a subsidiary of GLI. GLI Food will be liquidated and the proceeds of such liquidation will be distributed to holders of Allowed Claims against and Allowed Equity Interests in GLI Food. The Regional Subsidiaries will assume certain key unexpired leases of real property, assign such leases to GLI, and be dissolved. GLI Bus and GTSI have no assets of value and will be dissolved. Although the confirmation of the Plan as it pertains to Eagle has been continued, it is anticipated that the Equity Interests of GLI in Eagle will be cancelled and substantially all the assets of Eagle will be sold, with the proceeds thereof distributed to holders of Allowed Claims against Eagle as provided in the Plan.

B. *Treatment of Administrative Claims and Priority Tax Claims*

The Plan provides that all Allowed Administrative Claims against each of the Debtors will be paid (i) in cash, in full, on the Distribution Date, (ii) in the ordinary course of the Debtors' businesses, (iii) as otherwise agreed to by the holder of such Claim, or (iv) as directed by the Bankruptcy Court. Allowed Priority Tax Claims of each Debtor will be paid, (i) with Postpetition Interest, in annual cash installments within six years after the date of assessment of such Allowed Claim, (ii) in cash, in full, on the Distribution Date, or (iii) as otherwise agreed to by the holders of such Allowed Claims.

C. *Treatment of Priority Non–Tax Claims*

To the extent Allowed Priority Non–Tax Claims exist against the Debtors, such Allowed Claims will be satisfied in cash, in full, on the Distribution Date, or as otherwise agreed to by the holders of such Allowed Claims. The Debtors do not believe that any such liabilities will have a material adverse effect on their financial condition

or adversely affect the feasibility of the Plan.

### D. *Treatment of Secured Claims Against GLI*

The Debtors and the Secured Lenders have agreed to the terms of a consensual restructuring of all obligations arising under the Secured Loan Agreement. Under this consensual treatment, GLI and the Secured Lenders will enter into the Modified Secured Loan Agreement, which will provide for an original principal amount equal to the total of all amounts owed under the Secured Loan Agreement to the Secured Lenders as of the Effective Date (up to $160 million), less certain amounts paid by GLI on or before the Effective Date. The total amount of the obligation shall be divided into two component parts: the Modified GLI Revolver Secured Note, in the initial amount of $40 million, plus the amount of all issued and undrawn letters of credit as of the Effective Date (the revolving facility may be increased by an aggregate amount of up to $10 million if the Debtors succeed in making certain reductions in the overall exposure under the Modified Secured Loan Agreement); and the Modified GLI Secured Note in an amount equal to the balance of the obligations owed to the Secured Lenders. The obligations under the Modified Secured Loan Agreement shall be secured by a prior and first lien on all assets of GLI and Eagle, except the shares of stock evidencing ownership of GLI Holding.

Other Allowed Secured Claims against GLI, primarily represented by mortgages on real property, liens which secure real property taxes, and materialmen's liens will be (i) reinstated pursuant to section 1124(2) of the Bankruptcy Code with arrearages cured by cash payments made to the holders of such Allowed Secured Claims on the Distribution Date, (ii) satisfied by delivery of a Plan Secured Note, which shall be payable in five equal annual payments; (iii) satisfied by the surrender of the collateral securing such Allowed Secured Claims to the holders of such Allowed Claims with any Deficiency Amount receiving treatment as an Allowed Unsecured Claim

against GLI, (iv) satisfied by a cash payment equal to the amount of the Allowed Secured Claim, or (v) as otherwise agreed by GLI and the holder of such Claim.

### E. *Treatment of Unsecured Claims Against GLI/Issuance of the GLI Notes and New GLI Common Stock*

On the Effective Date, the pre-petition Equity Interests of GLI will be cancelled and GLI will issue and distribute 10,000,000 shares of New GLI Common Stock as follows: 8,515,000 shares shall be distributed on a pro rata basis to or for the benefit of the holders of Allowed Unsecured Claims against GLI; 985,000 shares shall be distributed to GLI Holding in partial consideration of the merger of GLI Holding with and into a wholly-owned subsidiary of GLI (such shares shall then be distributed on a pro rata basis to or for the benefit of Allowed Unsecured Claims against GLI Holding); and 500,000 shares shall be distributed to an employee stock ownership plan for the employees of GLI other than certain senior management personnel. As an incentive to GLI's management to enhance the future value of reorganized GLI, GLI will reserve shares of New GLI Common Stock representing 12% of the fully diluted shares of New GLI Common Stock for management incentive programs. Of this amount, options to purchase 3% of the shares of New GLI Common Stock will be available to be granted to senior managers at the Effective Date of the Plan. The exercise price for the initial grant will be equal to the average trading price of the New GLI Common Stock during the first twenty trading days after the Effective Date. An additional grant of options to purchase 4% of the shares of New GLI Common Stock will be made on the fifteenth trading day following the release of results of operations for GLI for the first full fiscal quarter following the Effective Date, with such options having an exercise price equal to the trading price of the New GLI Common Stock on the date of grant. Options to purchase the remaining 5% of the reserved shares will be available to be granted not sooner than one year following

the Effective Date, with such options having an exercise price equal to the trading price of the New GLI Common Stock on the date of grant.

GLI will issue and distribute GLI Notes in the aggregate original principal amount of $165,000,000, with $149,450,000 of the GLI Notes to be distributed on a pro rata basis to or for the benefit of the holders of Allowed Unsecured Claims against GLI and $15,550,000 of the GLI Notes to be issued and distributed to GLI Holding in partial consideration of the merger of GLI Holding with and into a wholly-owned subsidiary of GLI (such GLI Notes will then be distributed on a pro rata basis to or for the benefit of the holders of Allowed Unsecured Claims against GLI Holding).

Under the Plan, and pursuant to section 510(a) of the Bankruptcy Code, the subordination rights of the holders of the 13% Senior Notes and the holders of the 12½% Senior Subordinated Notes shall be settled and compromised so that the percentage recovery from the Debtors and BusLease of the holders of the 13% Senior Notes will be twice the percentage recovery of the holders of the 12½% Senior Subordinated Notes from the Debtors and BusLease.

### F.  *Treatment of Damages Claims*

Holders of Damages Claims against any of the Debtors for (i) personal injury and property damage allegedly caused by the tortious acts of the respective Debtors or their agents and (ii) workers' compensation claims are generally not liquidated in amount.  Moreover, with respect to many of these Claims, liability is contested.  Because the Bankruptcy Court may not have jurisdiction to liquidate these Claims (see 28 U.S.C. § 157(b)(2)(O)), the Plan employs an Alternative Dispute Resolution Procedure (the "ADR") for the liquidation and payment of these Claims.  Under the ADR, each Damages Claim will be subjected to a three-step process designed to produce a settlement with respect to the Claim.  If unsuccessful, the holder of the Damages Claim may then obtain relief from the Bankruptcy Court to pursue the Claim in an appropriate non-bankruptcy forum.  In

either event, if a Damages Claim becomes an Allowed Claim it shall then be satisfied first from third-party sources, including specifically, in the case of GLI, the ICC Trust Fund established pursuant to GLI's self-insurance program for liability claims, or Insurance Policies from which Damages Claimants may be entitled to recover all or part of the Allowed amount of their Claims. The Debtors currently believe that the third party sources will be sufficient to pay all Allowed Damages Claims in full. Nevertheless, to the extent the third-party sources ultimately prove insufficient, any deficiency will receive treatment to the same extent as an Allowed Unsecured Claim against the appropriate Debtor.

### G.  *Treatment of the NLRB Claim*

The NLRB has filed a Proof of Claim on behalf of members of the Union for back pay damages allegedly arising from the pre-petition labor dispute between GLI and certain of GLI's employees and the resulting strike.  As a basis for this Claim, the NLRB has asserted that GLI committed a number of unfair labor practices under the National Labor Relations Act, which practices caused or extended the strike.  GLI has maintained that the allegations of the NLRB are without merit and that GLI is not liable for any back pay.

With respect to the treatment of the NLRB Claim in these bankruptcy proceedings, GLI has (i) obtained a ruling from this Court that the NLRB Claim shall be classified as an Unsecured Claim against GLI, except to the extent any portion of the Claim may be entitled to treatment under section 507(a)(3) or (4) of the Bankruptcy Code (GLI has strongly opposed any such treatment, but has not raised this issue with the Bankruptcy Court as of this time), and (ii) obtained a ruling from this Court estimating for purposes of allowance pursuant to section 502(c) of the Bankruptcy Code the NLRB Claim in the total amount of $31,250,000.  Accordingly, the Plan treats the NLRB Claim as a Contested GLI Class 7 Unsecured Claim, and provides such treatment only up to the amount of this Court's estimate.  As with all other

Contested Claims, no distribution will be made to the holder of the NLRB Claim, however, until the NLRB Proceeding has been decided by Final Order; in the interim, an Escrowed Distribution Amount equivalent to the Pro Rata Share of GLI Notes and New GLI Common Stock attributable to the estimated amount of the NLRB Claim will be delivered to the Pool Trustee.

### H. *The Treatment of Dial*

Except as otherwise provided in the Plan, all claims of Dial will be treated and the Dial Real Estate Leases, the Dial Equipment Leases, the Trademark License, and various other executory agreements with Dial and the Dial Affiliates will be assumed by GLI on the terms and conditions set forth in the Claims Treatment Agreement. All cure payments arising from such assumptions will be satisfied by delivery of the Cure Note in the approximate amount of $20.0 million, which will be paid out over six years. In addition, Dial has agreed to the enforcement of the subordination rights under the 11% Junior Subordinated Note and has waived its Equity Interests in GLI Holding.

### I. *The Treatment of Miscellaneous Secured Claims*

The Plan also includes general Secured Claims classes with respect to each Debtor for the treatment of Secured Claims not otherwise specifically identified in the Plan. Except for a materialmen's lien claim and Secured Claims for ad valorem real property taxes against GLI, the Debtors do not know of any such Secured Claims, and this class has been added to each Debtor's Plan solely to ensure that the respective Plans provide treatment for all potential holders of Secured Claims. Any such Allowed Secured Claim, at the option of the appropriate Debtor, will be satisfied by (i) surrender of the collateral securing such Allowed Secured Claim, with any Deficiency Amount receiving treatment as an Allowed Unsecured Claim of the appropriate Debtor, (ii) cure and reinstatement of the Secured Claim pursuant to section 1124(2) of the Bankruptcy Code, or (iii) a cash pay-ment equal to the amount of the Allowed Secured Claim, or (iv) delivery of a Plan Secured Note.

### J. *The TCT Plan*

The Debtors anticipate that substantially all the assets of TCT will be sold prior to the Effective Date, and that pursuant to such sale all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non–Tax Claims, and Allowed Unsecured Claims against TCT will be assumed and paid by the purchaser. The net proceeds of the sale will then be paid to the Secured Lenders and applied to the amounts outstanding under the Secured Loan Agreement. Alternatively, if TCT is not sold prior to confirmation of the Plan, TCT will pay all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non–Tax Claims, and Allowed Unsecured Claims against TCT in full in cash, unless otherwise agreed by the holder of such a Claim. The TCT Guaranty will be cancelled on the Effective Date. The pre-petition Equity Interests of TCT will be unimpaired and will be retained by GLI.

### K. *The GLI Bus Plan*

The Debtors currently believe that there are no Administrative Claims, Priority Tax Claims, or Priority Non–Tax Claims against GLI Bus. Because of the absence of value attributable to the only asset of GLI Bus, the Old GLI Common Stock, the GLI Bus Pledge Agreement will be cancelled as of the Effective Date. The Secured Lender Claims will, however, be satisfied in full pursuant to the global restructuring of the Secured Loan Agreement under the Plan. It is anticipated that the holders of Allowed Unsecured Claims against GLI Bus will receive no distribution on account of their Claims. The pre-petition Equity Interests of GLI Bus will be cancelled on the Effective Date and GLI Bus will be dissolved.

### L. *The GLI Food Plan*

The Plan contemplates the liquidation of GLI Food and the distribution of the pro-

ceeds of that liquidation in a manner that will pay in full all Allowed Claims against GLI Food. The pre-petition Equity Interests of GLI Holding in GLI Food will be cancelled as of the Effective Date, but GLI Holding or its successor in interest will retain the right to recover any proceeds remaining after the liquidation of GLI Food and the payment in full of all Allowed Claims against GLI Food. The operations of GLI Food will be merged into GLI under the Plan.

### M. *The GLI Holding Plan*

Each holder of an Allowed Unsecured Claim against GLI Holding will receive (a) a Pro Rata Share of (i) 985,000 shares of New GLI Common Stock, and GLI Notes in an aggregate original principal amount of $15,550,000, or (ii) the proceeds thereof, and (b) a Pro Rata Share of any cash of GLI Holding on the Distribution Date (after payment or reserve for Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Non–Tax Claims against GLI Holding) as treatment of their Allowed Claims against GLI Holding. Under the Plan, GLI Holding will receive the GLI Notes and the New GLI Common Stock to be so distributed in consideration for the merger of GLI Holding into a newly-formed, wholly-owned subsidiary of GLI, with GLI Holding as the surviving corporation. The pre-petition Equity Interests of GLI Holding will be cancelled on the Effective Date pursuant to such merger of GLI Holding and the holders of such Equity Interests will receive no distributions under the Plan unless and until all Allowed Unsecured Claims against GLI Holding are paid in full. The Debtors anticipate that no distributions will be made to the holders of Equity Interests in GLI Holding.

### N. *The Regional Subsidiary and GTSI Plans*

The Regional Subsidiaries have no assets except for certain unexpired leases of real property under which the Regional Subsidiaries are lessees. Monetary defaults arising under certain of these leases, which will be assumed and assigned to GLI, will be paid with funds provided by GLI (as will the Allowed Administrative Claims, the Allowed Priority Tax Claims, and Allowed Priority Non–Tax Claims against such Regional Subsidiary) in consideration of such assumption and assignment.

The Regional Subsidiary Guaranty Secured Claims and the GTSI Guaranty Secured Claim will receive no direct distribution under the Plan on account of such Secured Claims. All the assets of the Regional Subsidiaries, consisting of unexpired leases, will remain encumbered by the liens securing repayment of the Secured Lenders Claims, to the extent such leases will be assumed and assigned to GLI. GTSI has no assets of any value. The Secured Lender Claims against the Regional Subsidiaries and GTSI will, however, be satisfied in full pursuant to the global restructuring of the Secured Loan Agreement under the Plan. It is anticipated that no distributions will be made to the holders of Unsecured Claims against the Regional Subsidiaries and GTSI. The Equity Interests of the Regional Subsidiaries and GTSI will be cancelled as of the Effective Date and such Debtors will be dissolved.

### IV.

*All Objections to Confirmation of the Plan Have Been Withdrawn or are Overruled*

25. The following parties filed objections to confirmation of the Plan:

(a) American Locker;

(b) BusLease, Inc.;

(c) Crowley;

(d) the Washington Drivers;

(e) Elenar;

(f) Empire Lines, Inc.,

(g) the Independent Bus Companies Creditors' Committee (the "Interline Carriers");

(h) the NLRB;

(i) the Louisiana Department of Taxation and Revenue ("Louisiana");

(j) Brumeca;

(k) KLL;

(*l*) Ohio Street Garage Associates ("OSGA");

(m) Port Authority;

(n) San Diego County Tax Collector ("San Diego");

(*o*) The United States;

(p) Texas;

(q) Various Ad Valorem Taxing Jurisdictions (the "Taxing Jurisdictions"); and

(r) Various Taxing Authorities (the "Taxing Authorities").

26. The objections of American Locker; BusLease, Inc.; Crowley; Empire Lines, Inc.; the Interline Carriers; KLL; OSGA; Port Authority; the United States; the Taxing Jurisdictions; and the Taxing Authorities were withdrawn before or at the Confirmation Hearing.

27. The other objections, including any late filed objections, are overruled.

28. In overruling the objections of the NLRB and the Union, the Court specifically makes the following findings and conclusions:

(a) The Debtors have not taken the position, or requested the Court to determine, that confirmation of the Plan discharges the putative right of the striking employees to reinstatement under the provisions of the National Labor Relations Act, or that confirmation of the Plan settles the existing labor dispute between GLI and the striking employees;

(b) The Plan does not request discharge of any alleged reinstatement obligation that may exist in connection with the existing labor dispute between GLI and the striking employees;

(c) The Plan's treatment of the NLRB Claim, as previously estimated by this Court for purposes of allowance pursuant to section 502(c) of the Bankruptcy Code, is proper and comports with all relevant requirements of the Bankruptcy Code;

(d) Confirmation of the Plan results in the discharge of the NLRB Claim as estimated by this Court; to the extent it is ultimately determined that the NLRB has a claim in excess of this Court's estimate, such excess is discharged only if provided for by section 1141 of the Bankruptcy Code;

(e) The Debtors have not requested this Court to determine in connection with confirmation of the Plan the effect of the section 1141 discharge on any amount by which the NLRB Claim may ultimately be determined to exceed this Court's estimate;

(f) Moreover, given the remote contingency of the NLRB Claim, the effect of the section 1141 discharge on any amount by which the NLRB Claim may ultimately be determined to exceed this Court's estimate is not ripe for determination.

(g) Furthermore, the unrefuted evidence shows that the Debtors will have sufficient fund-raising abilities to satisfy any final judgment ultimately entered in favor of the NLRB with respect to the NLRB Claim in excess of the amount estimated by this Court, regardless of the manner in which such Claim is classified, and even if the Debtors were unsuccessful in asserting the discharge under section 1141 of the Bankruptcy Code as an affirmative defense to the enforcement of such judgment; this undisputed evidence further supports the determination that the Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code;

(h) The Plan provides proper treatment of any portion of the NLRB claim ultimately determined to be entitled to priority treatment under sections 507(a)(3) and (4) of the Bankruptcy Code; under the circumstances there is no need for the Debtors to establish an escrow for the payment of any such amount;

(i) To the extent the remaining objections of the NLRB and the Union with respect to the terms and provisions of the Contested Claim Pool Trust Agreement are valid, they are curable and may be resolved at a subsequent hearing to be held with respect to the Contested

Claim Pool Trust Agreement;[3]

(j) The Plan's classification of the 11% Junior Subordinated Note Claim, the 12½% Senior Subordinated Note Claims, and the 13% Senior Note Claims in GLI Class 7 with all other Unsecured Claims is appropriate and proper under all relevant provisions of the Bankruptcy Code; moreover, any error with respect to the classification of such Claims is harmless because the evidence shows clearly that even if separately classified, all classes of neutral, senior, and subordinated Unsecured Claims would have accepted the Plan; and even if one of such classes had rejected the Plan, the Plan would have nevertheless been confirmable under section 1129(b)(2)(B)(ii) of the Bankruptcy Code because no junior class would be receiving or retaining any property under the Plan; and

(k) The treatment provided to the holders of the subordinated Note Claims under the Plan is appropriate and proper under all relevant provisions of the Bankruptcy Code and does not dilute the distribution to the holders of other Unsecured Claims.

■ 29. In overruling the remaining objections of San Diego, Louisiana, and Texas, the Court specifically makes the following findings and conclusions:

(a) The Plan's treatment of any Claim for unpaid taxes, to the extent it is entitled to priority under section 507(a)(7) of the Bankruptcy Code, is proper under section 1129(a)(9)(C) of the Bankruptcy Code;

(b) The treatment of any Claim for unpaid taxes, to the extent it is a Secured Claim, is "not discriminatory" and is "fair and equitable" within the meaning of section 1129(b)(2)(B) of the Bankruptcy Code; and

(c) Under the circumstances, the making of annual payments to the holder of any Claim for unpaid taxes that is to receive deferred payments under the

Plan are appropriate under all relevant provisions of the Bankruptcy Code.

■ 30. In overruling the objection of Brumeca, the Court specifically makes the following findings and conclusions:

(a) To the extent the objections of Brumeca relate to the confirmation of the Eagle Plan, such objections shall be carried until the Eagle Plan is considered for confirmation; and

(b) To the extent Brumeca (which has claims against only Eagle) has objected to confirmation of the other Debtors' Plans on the basis that the Debtors should be substantively consolidated, the Court finds no support for such position and overrules the objection.

31. The settlements entered into by the Debtors with respect to the withdrawal of the objections to confirmation filed by the United States and KLL, stated on the record at the Hearing, are appropriate under all relevant provisions of the Bankruptcy Code and the Bankruptcy Rules, and were not objected to by any party at the Hearing.

V.

*The Plan Satisfies All the Requirements For Confirmation Contained in Section 1129 of The Bankruptcy Code*

A. *The Plan Satisfies Section 1129(a)(1) of the Bankruptcy Code*

32. The Court finds and concludes that the Plan satisfies all the applicable provisions of the Bankruptcy Code.

Due and Proper Notice of The Disclosure Statement Hearing and The Confirmation Hearing Was Given to All Parties In Interest

33. Any person required to receive notice of the hearings on the adequacy of the Disclosure Statement and confirmation of the Plan has received due, proper, and adequate notice. Any person who requested a copy of any of the documents referred to in the Disclosure Statement, which were not transmitted to holders of Claims and Equi-

---

3. Subsequent to the oral announcement of these findings and the entry of written findings, all

such objections have been cured.

ty Interests, and made such a request in the manner set forth in the Disclosure Statement, received a copy of such documents. All persons having an interest, vested or contingent, present or future, to the extent such person can be presently identified, received a copy of the above-referenced materials or had due, proper and adequate notice of the hearing on confirmation of the Plan. Due, proper and adequate notice of, and an opportunity to appear at, the hearing was given to all persons with any Claim against or Equity Interest in the Debtors.

### The Plan Properly Designates Classes of Claims and Interests and the Classification Scheme is Reasonable

■ 34. Section 1123(a)(1) provides that a plan must designate classes of claims and interests. The Plan adequately classifies all Claims and Equity Interests. Administrative and Priority Tax Claims are not classified because section 1123(a)(1) of the Bankruptcy Code does not require the classification of such Claims, and because they must receive the treatment specified in section 1129(a)(9) of the Bankruptcy code and cannot be otherwise impaired. The Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

### The Plan's Classification Scheme is Reasonable and Satisfies Section 1122(a) of The Bankruptcy Code

■ 35. Section 1122(a) of the Bankruptcy Code states that a plan may place a claim or interest in a particular class if such claim or interest is substantially similar to the other claims or interests of such class. A classification scheme satisfies section 1122(a) of the Bankruptcy Code when a reasonable basis exists for the choices made and all claims within a particular class are substantially similar. The Plan's classification scheme of Claims and Equity Interests is reasonable and necessary to implement the Plan and satisfies the requirements of section 1122 of the Bankruptcy Code.

36. All Unsecured Claims against the GLI estate are classified together in GLI Class 7. Under the circumstances, such classification is proper under section 1122(a) because such Claims have substantially similar rights to the assets of GLI.

### The Plan Satisfies the Requirements of Section 1123(a)(2) of The Bankruptcy Code

37. In accordance with section 1123(a)(2) of the Bankruptcy Code, Article 3 of the Plan specifies the impaired and unimpaired classes.

### The Plan Satisfies the Requirements of Section 1123(a)(3) of The Bankruptcy Code

38. In accordance with section 1123(a)(3) of the Bankruptcy Code, Article 4 of the Plan specifies the treatment of each impaired class.

### The Plan Satisfies the Requirements of Section 1123(a)(4) of The Bankruptcy Code

39. Section 1123(a)(4) of the Bankruptcy Code requires the Plan to provide the same treatment for each claim or interest of a particular class, unless the holder of the claim or interest agrees to less favorable treatment of such particular claim or interest. The Plan provides the same treatment for each Claim or Equity Interest in each class that contains more than one Claim or Equity Interest.

### The Plan Satisfies the Requirements of Section 1123(a)(5) of The Bankruptcy Code

40. In accordance with section 1123(a)(5), the Plan provides adequate means for the Plan's implementation. Article 8 of the Plan specifies in detail the terms for implementing the Plan.

### The Plan Satisfies the Requirements of Section 1123(a)(6) of The Bankruptcy Code

41. In accordance with section 1123(a)(6) of the Bankruptcy Code, under section 8.4 of the Plan the amended charter and bylaws of each Debtor restrict the issuance of non-voting equity securities. Section 1123(a)(6) of the Bankruptcy Code also requires a plan to provide, as to the several classes of securities possessing voting power, if more than one, for an appropriate distribution of such power among such classes in accordance with section

1123(a)(6) of the Bankruptcy Code. Because the Debtors will have only one class of securities possessing voting power, the provisions of section 1123(a)(6) of the Bankruptcy Code concerning the distribution of such power are inapplicable.

### The Plan Satisfies the Requirements of Section 1123(a)(7) of The Bankruptcy Code

■■■ 42. Section 1123(a)(7) of the Bankruptcy Code requires a plan to provide for the selection of any director, officer, or trustee under the plan in a manner consistent with the interests of creditors and equity security holders and with public policy. The Plan complies with this requirement.

43. Following the Effective Date of the Plan, the selection of the officers of the reorganized Debtors will be in the control of the Board of Directors in accordance with applicable corporate law. The manner of selection of both officers and directors is consistent with existing corporate law, the interests of creditors and shareholders, and public policy. The identify of the individuals who will serve as the executive officers of the Debtors, until such time as replaced by the Board of Directors, is described in the Disclosure Statement and in section 8.3 of the Plan.

44. Article 8, section 8.3 of the Plan states that on the Effective Date the reconstituted Board of Directors of GLI shall initially be comprised of seven members. Frank J. Schmieder and J. Michael Doyle will serve as two of the initial directors of GLI. The remaining five directors of GLI, who were selected by the Creditors' Committee and the Official Steering Committee, will be Charles A. Lynch, Thomas F. Meagher, Patrick Foley, Richard Caley, and Charles Lee.

### The Assumption and/or Rejection of Executory Contracts and Unexpired Leases Pursuant to Section 1123(b)(2) is Proper

45. The Plan constitutes a motion by the Debtors to reject all pre-petition executory contracts and unexpired leases to which any of the Debtors are parties as of the Effective Date of the Plan, except for an executory contract or unexpired lease that: (a) has been assumed or rejected pursuant to Final Order of the Bankruptcy Court; (b) is specifically designated in Appendix II to the Plan as an executory contract or unexpired lease to be assumed under the Plan; or (c) is the subject of a motion to reject that is pending before the Court on the Effective Date.

46. The Debtors' decisions regarding the assumption and/or rejection of executory contracts and unexpired leases, as reflected in the Plan, are based on and are within the sound business judgment of the Debtors, and are in the best interests of the Debtors and their respective estates.

47. The Debtors have provided for appropriate prompt cure of defaults under executory contracts and unexpired leases to be assumed under the Plan and have otherwise complied with all requirements of section 365 of the Bankruptcy Code for the assumption of such executory contracts and unexpired leases.

48. The Plan also constitutes a motion by the Regional Subsidiaries to assign to GLI all assumed executory contracts and unexpired leases in consideration for (a) GLI's advances of funds to pay and provide prompt cure of defaults, (b) GLI's assumption of all obligations with respect to the assigned leases, and (c) GLI's agreement to pay Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims of the Regional Subsidiaries.

49. The Plan also constitutes a motion by GLI Food to assign to GLI all assumed executory contracts and unexpired leases.

50. The assignment of assumed executory contracts and unexpired leases by the Regional Subsidiaries and GLI Food to GLI is in the best interests of the respective Debtors' estates and otherwise complies with the requirements of section 365 of the Bankruptcy Code for the assignment of assumed executory contracts and unexpired leases.

### All Settlements and Compromises Incorporated in the Plan Pursuant to Section 1123(b)(3) are Reasonable, Fair, and Equitable, and in the Best Interests of the Debtors' Respective Estates

51. The Court is required to make an independent determination of the fairness

to the Debtors and their estates of the settlements embodied in the Plan. The Court determines that such settlements are reasonable, fair, and equitable, and in the best interests of the Debtors and the Debtors' estates. In approving the compromise and settlement of potential claims, this Court has considered:

(a) The balance of the likelihood of success of claims asserted by the claimants against the likelihood of success of the defenses or counterclaims possessed by the Debtors;

(b) The balance of the likelihood of success of claims asserted by the Debtors against the likelihood of success of the defenses or counterclaims possessed by the claimants;

(c) The complexity, cost, and delay of litigation that would result in the absence of settlements;

(d) The lack of objection to the settlements by any creditor or party in interest and the acceptance of the Plan by a substantial majority of the holders of Claims and Equity Interests; and

(e) The fact that the Plan, which gives effect to the settlements, is the produce of extensive arms'-length negotiations among the Debtors, the Creditors Committee, the Official Steering Committee, and numerous other parties in interest.

52. The Plan provides for the settlement of mutual claims that the Debtors, on the one hand, and Dial and the Dial Affiliates, on the other hand, have or may have against one another (the "Dial Settlement") pursuant to the terms of the Claims Treatment Agreement entered into on August 23, 1991. The parties to the Dial Settlement engaged in lengthy negotiations regarding the Dial Settlement. The record in these cases shows that, with the advice of their counsel and their financial advisors, the Debtors have carefully evaluated all aspects of the Dial Settlement. In addition, the Creditors' Committee, the Official Steering Committee, and their counsel, financial advisors, and accountants have evaluated the Dial Settlement. The Debtors and the Creditors' Committee and the Official Steering Committee have conclud-

ed that the consummation of the transactions contemplated by the Dial Settlement is in the best interests of the Debtors and their estates.

53. The settlements approved in the Plan, including the Dial Settlement, fall within a range of reasonableness for the resolution of complex litigation and are fair and equitable and in the best interests of the Debtors and their estates.

### The Plan Complies with Bankruptcy Rule 3016(c)

54. The Plan is dated and identifies the entity submitting the Plan in accordance with Bankruptcy Rule 3016(c).

### The Distribution of Plan Securities is in Accordance with Section 1145 of the Bankruptcy Code

55. The distribution of the GLI Notes and New GLI Common Stock to holders of Allowed GLI Class 7 Unsecured Claims is a sale of securities by GLI in accordance with section 1145(a)(1) of the Bankruptcy Code.

56. The distribution of the GLI Notes and New GLI Common Stock to holders of Allowed GLI Holding Class 4 Unsecured Claims is a sale of securities of an affiliate of GLI Holding participating in a joint plan with GLI Holding in accordance with section 1145(a)(1) of the Bankruptcy Code.

### B. *The Debtors Have Satisfied the Requirements of Section 1129(a)(2) of The Bankruptcy Code*

57. Section 1129(a)(2) of the Bankruptcy Code requires that the Debtors have complied with all the applicable provisions of the Bankruptcy Code. The Debtors have complied with all the provisions of the Bankruptcy Code and the Bankruptcy Rules governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure Statement, and all other matters considered by this Court in connection with these Chapter 11 Cases. Proper, sufficient, and adequate notice of the Confirmation Hearing and all other hearings in these Chapter 11 Cases has been given to all holders of Claims and Equity Interests and all other parties in interest required to re-

ceive notice. The solicitation of votes from holders of Claims and Equity Interests was in good faith and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules. The solicitation and tabulation of ballots were proper and adequate. The Debtors have complied with all orders of this Court. The Debtors have fulfilled all of the obligations and duties owed to their respective estates as required and set forth in sections 1107 and 1108 of the Bankruptcy Code. Therefore, the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.

C. *The Plan Satisfies Section 1129(a)(3) of The Bankruptcy Code*

58. In accordance with section 1129(a)(3) of the Bankruptcy Code, the Plan has been proposed in good faith and not by any means forbidden by law. In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the formulation of the Plan.

59. Based on the uncontroverted or substantially uncontroverted evidence presented at the Hearing, the Court finds and concludes that the Plan has been proposed with the legitimate and honest purpose of reorganizing the Debtors' business affairs and to maximize the returns available to creditors. The Plan is based on extensive arm's-length negotiations among the Debtors, the Creditors' Committee, the Official Steering Committee, and other creditors and parties in interest, as well as their legal and financial advisors. The fact that the Plan has been accepted overwhelmingly by all voting impaired classes of Claims and Equity Interests demonstrates the conclusions of creditors that the Plan maximizes the distributions available to them.

60. The Debtors are the only remaining provider of nationwide bus transportation service. They provide millions of individuals with the only form of intercity transportation services available to them. The Plan enables the Debtors to: (a) continue providing necessary services to the public; (b) provide employment for thousands of employees; (c) retain their going concern val-

ues; and (d) provide a meaningful return to their creditors. In light of all the circumstances, the Plan was proposed in good faith.

D. *The Plan Satisfies Section 1129(a)(4) of The Bankruptcy Code*

61. All payments made or to be made by Debtors or by a person issuing securities or acquiring property under the Plan for services, or for costs and expenses in or in connection with these cases, or in connection with the Plan and incident to these cases, have been approved by or are subject to the approval of the Court as reasonable. The Court has approved the interim payments by the Debtors of costs and expenses of professionals retained in each respective case. Interim payments remain subject to review and approval by the Court upon final application pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code.

E. *The Plan Satisfies Section 1129(a)(5) of The Bankruptcy Code*

62. Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires the Debtors to disclose the identity of the individuals who will hold positions with the Debtors after confirmation of the Plan. Section 1129(a)(5)(A)(ii) requires that the service of such individuals be consistent with the interests of creditors and equity security holders and with public policy. Section 1129(a)(5)(B) requires the Debtors to disclose the identity of any insider that will be employed or retained by the reorganized debtor and the nature of any compensation for such insider.

63. The identity and affiliations of the persons who, after confirmation of the Plan, are proposed to be directors or officers of the Debtors have been, to the extent known as of the Hearing, fully disclosed and the appointment to or continuance in such offices by such individuals is consistent with the interests of the holders of Claims and Equity Interests and with public policy. In the Disclosure Statement, the executive officers are listed and de-

scribed together with each respective officer's base salary and his affiliations.

64. The Debtors also have disclosed the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for that insider.

F. *Section 1129(a)(6) of The Bankruptcy Code Is Not Applicable to The Plan*

65. The Plan does not provide for change in any rates that require regulatory approval.

G. *The Plan Satisfies the Requirements of Section 1129(a)(7) of The Bankruptcy Code*

66. Section 1129(a)(7) requires each creditor or equity holder in an impaired class to accept the plan or receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. According to the liquidation analysis in the Disclosure Statement, the Debtors estimate that the liquidation value of their assets is $206,254,000 before deducting expenses of liquidation and costs of delay. Based on the virtually undisputed testimony and documentary evidence presented at the Hearing, the Court finds that all impaired classes will receive at least as much under the Plan as they would under a chapter 7 liquidation. Accordingly, the Plan satisfies the "best interest of creditors" test under section 1129(a)(7) of the Bankruptcy Code.

H. *Section 1129(a)(8) of The Bankruptcy Code Is Not Applicable to The Plan*

67. Each class that is impaired under the Plan has accepted the Plan, except for GLI Classes 9 and 10, GLI Bus Classes 5 and 6, Regional Subsidiary Classes 5 and 6, and GTSI Classes 5 and 6, which are deemed to have rejected the Plan. The Debtors have requested confirmation of the Plan under section 1129(b) of the Bankruptcy Code and the Court has determined that the Plan is confirmable under section 1129(b) of the Bankruptcy Code. Thus, section 1129(a)(8) of the Bankruptcy Code is not applicable.

I. *The Plan Satisfies Section 1129(a)(9) of The Bankruptcy Code*

68. The Plan satisfies the requirements of all three subsections of section 1129(a)(9) of the Bankruptcy Code. As required by section 1129(a)(9)(A) of the Bankruptcy Code, except as otherwise agreed by the holder of a particular Administrative Claim, such Claims will be paid in cash on the later of the Effective Date or the Distribution Date, in the ordinary course of business, or, with respect to cure payments arising from the assumption of executory contracts and leases, as otherwise required by section 365 of the Bankruptcy Code. As required by section 1129(a)(9)(B) of the Bankruptcy Code, except as otherwise agreed by the holder of a particular Priority Non–Tax Claim, such Claims will be paid in cash on the later of the Effective Date or the Distribution Date. As required by section 1129(a)(9)(C) of the Bankruptcy Code, except as otherwise agreed by the holder of a particular Priority Tax Claim, such Claims will receive either payment in cash on the Effective Date or deferred cash payments over a period of six years from the date of assessment of such Claims, having a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims.

J. *The Plan Satisfies Section 1129(a)(10) of The Bankruptcy Code*

69. Pursuant to section 1129(a)(10) of the Bankruptcy Code, at least one impaired class of claims must accept the plan, determined without including any acceptance of the plan by any insider. The Plan satisfies section 1129(a)(10) because each Debtor has at least one impaired class of Claims that has accepted the Plan, excluding any acceptance by an insider.

K. *The Plan is Feasible and Therefore Satisfies Section 1129(a)(11) of The Bankruptcy Code*

70. Section 1129(a)(11) of the Bankruptcy Code requires that a plan must be "feas-

ible," that is, if the plan is not a liquidating plan (as authorized by section 1123(b)(4) of the Bankruptcy Code), the Court must determine that the debtor, or its successor under the plan, is not likely to require liquidation or further financial reorganization.

71. The uncontroverted or substantially uncontroverted evidence introduced at the Hearing demonstrates that there is a reasonable likelihood that the Debtors will be able to perform their obligations under the Plan. The Court finds and concludes that the Plan is feasible and confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, other than as expressly provided in the Plan.

#### L. *The Plan Satisfies Section 1129(a)(12) of The Bankruptcy Code*

72. In accordance with section 1129(a)(12) of the Bankruptcy Code, the Plan provides for the payment, on the Effective Date of the Plan, of all fees payable under 28 U.S.C. § 1930.

#### M. *The Plan Satisfies Section 1129(a)(13) of The Bankruptcy Code*

73. The Plan provides for the continuation after the Effective Date of payment of all retiree benefits in accordance with the terms and conditions of the Debtors' Retiree Benefit Plans as required by sections 1114 and 1129(a)(13) of the Bankruptcy Code.

#### N. *The Plan Satisfies the Requirements of Section 1129(b) of The Bankruptcy Code*

74. A number of impaired classes are deemed to have rejected the Plan because they will receive no distributions under the Plan. 11 U.S.C. § 1126(g). Nevertheless, the Plan may still be confirmed through the "cramdown" provisions contained in section 1129(b) of the Bankruptcy Code. The Debtors have requested confirmation under section 1129(b) of the Bankruptcy Code.

75. In order to confirm a plan pursuant to the so-called "cramdown" provisions of section 1129(b) of the Bankruptcy Code, a plan must not discriminate unfairly and it must be fair and equitable. In addition, if a plan impairs one or more classes of claims, then at least one impaired class of claims must vote in favor of the plan without counting the vote of an insider. 11 U.S.C. § 1129(a)(10). The Plan satisfies these requirements.

76. The Plan des not provide disparate treatment for any similar Claims. Unsecured Claims against each estate are treated similarly unless a reasonable basis exists for different treatment. The Plan does not unfairly discriminate against Claims of similar legal standing because no class will receive more than it is legally entitled to receive.

77. All holders of Allowed Secured Claims will, at the Debtors' option, receive the present value of their Secured Claims, be unimpaired as provided in section 1124 of the Bankruptcy Code, or receive their collateral in satisfaction of their Secured Claims. The Plan is fair and equitable with respect to all Secured Claims that have not accepted the Plan.

78. To be fair and equitable to a class of Unsecured Claims, the Plan must provide that each holder of an Allowed Unsecured Claim will receive property having a present value equal to the allowed amount of its Claim or, if Unsecured Claims are not paid in full, then no class of claims or interests junior to that of the dissenting class may receive or retain any property under the Plan. 11 U.S.C. § 1129(b)(2)(B). With the exception of the GLI Food and TCT cases, no person having a claim junior to the Unsecured Claims will receive or retain any property under the Plan. In the GLI Food and TCT cases, the holders of Unsecured Claims will be paid in full. Accordingly, the Plan is fair and equitable to the holders of Unsecured Claims as provided by section 1129(b)(2)(B) of the Bankruptcy Code.

79. To be fair and equitable with respect to a class of interests, *i.e.*, preferred or common stockholders, the Plan must

provide either: (a) that each member of such class receives or retains property with a present value equal to the greatest of (i) any fixed liquidation preference, (ii) any fixed redemption price, or (iii) the value of such interest; or (b) no interest junior to such class receives or retains any property. 11 U.S.C. § 1129(b)(2)(C). The Plan is fair and equitable as to all equity interest holders because: (i) no class senior to any of the dissenting impaired classes are receiving more than payment in full on their claims; and (ii) no interest junior to the classes of Equity Interests in the Plan will receive or retain any property.

*O. The Plan Satisfies the Requirements of Section 1129(d) of The Bankruptcy Code*

80. The primary purpose of the Plan is not avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act of 1933, and there has been no objection filed by any governmental unit asserting such avoidance.